[No. F009707. Fifth Dist. June 28, 1989.]

HARTFORD ACCIDENT AND INDEMNITY COMPANY, Plaintiff and Appellant, v.
SEQUOIA INSURANCE COMPANY et al., Defendants and Appellants.

1288

COUNSEL

McCormick, Barstow, Sheppard, Wayte & Carruth and James P. Wagoner for Plaintiff and Appellant.

Barfield, Dryden & Ruane, Dryden, Margoles, Schimaneck, Hartman & Kelly, Laurene A. Wheeler, J. Ryan Roe, Leo O'Brien, Eldridge, Anderson & Weakley and Jeffrey H. Smith for Defendants and Appellants.

OPINION

**BEST, Acting P. J.—**

## INTRODUCTION

On this appeal we must determine the relative ranking of insurance coverage provided by three separate insurance companies: Hartford Accident and Indemnity Company (hereinafter Hartford), Sequoia Insurance Company (hereinafter Sequoia), and Transamerica Insurance Company (hereinafter Transamerica). Hartford brought this action to recoup settlement funds approximating $1.8 million that Hartford paid in the underlying action.

## STATEMENT OF THE CASE AND FACTS

On February 11, 1983, there occurred a one-vehicle "roll over" accident involving a 1976 Chevrolet Blazer owned by Daniel J. Fialho and operated

by Gina Petrocelli with permission of Mr. Fialho. Ms. Petrocelli was killed in the accident and her passengers, Tina Snow, Melissa Fialho and Steven Gardener, all received injuries.

Ms. Snow brought an action for personal injuries against Pat Hallford, as special administrator of the estate of Gina Petrocelli, deceased, Daniel J. Fialho et al. in Merced County Superior Court, action No. 72079. On October 15, 1986, Hartford settled this action for approximately $1.8 million. Hartford had previously settled the claims of the remaining two passengers in 1984 for a total of approximately $63,000.

On February 11, 1986, Hartford filed its complaint for declaratory relief naming Sequoia and Transamerica as defendants. Answers were filed by both defendants and, on April 15, 1987, Hartford filed its motion for summary judgment, requesting a determination of the relative ranking of the insurance policies in question. Thereafter, it was stipulated that each party's pleadings be considered motions for summary judgment. Following a hearing on the motions, the court entered its order on July 14, 1987, granting summary judgment in favor of Hartford.

Transamerica's motion for reconsideration, joined in by Sequoia, was filed on July 30, 1987, and, following a hearing, denied on October 9, 1987.

An amended declaratory judgment was entered on October 23, 1987, in favor of Hartford and against Sequoia in the amount of $500,000, plus $35,000 as prejudgment interest at the rate of 7 percent from October 14, 1986, to October 14, 1987, and in favor of Hartford and against Transamerica in the amount of $268,418, but without prejudgment interest.

Sequoia and Transamerica appeal from the summary judgment and order denying their motion for reconsideration. Hartford cross-appeals from that portion of the judgment denying Hartford's request for prejudgment interest with respect to the sum recovered from Transamerica.

THE INSURANCE POLICIES

At the time of the accident, there were in full force and effect four different policies of insurance. These included two policies, a primary and an excess, provided by Hartford to the Fialhos, the owners of the 1976 Chevrolet Blazer involved in the accident. The two remaining policies, also a primary and an excess, were provided by Sequoia and Transamerica, respectively, and insured Clifton's Corner Drug, Inc., and James Petrocelli (Gina's father).

HARTFORD BUSINESS AUTO POLICY

Hartford Business Auto Policy No. 51 AB FC6905 insured Daniel Fialho and Henry Fialho, doing business as Fialho Farms, and covered the policy period November 10, 1982, to November 10, 1983. The policy provided automobile liability coverage with a limit of liability of $500,000 per accident and specifically describes as one of the insured vehicles the 1976 Chevrolet Blazer involved in the accident.

HARTFORD UMBRELLA LIABILITY POLICY

Hartford Umbrella Liability Policy (Hartford Umbrella policy) No. 51 RHU BC5752 insured Daniel Fialho and Henry Fialho, doing business as Fialho Farms, and covered the policy period November 10, 1982, through November 10, 1983. This policy extends coverage to persons using an owned automobile with the permission of the named insured and provides coverage in the amount of $2 million for an occurrence in excess of "underlying insurance" in the amount of $500,000 for automobile liability and $300,000 for both general liability and water craft liability. The "Declarations" page of the Hartford Umbrella policy provides in part as follows:

"6. Schedule of Underlying Insurance Policies

"SEE ATTACHED EXTENSION SCHEDULE OF UNDERLYING INSURANCE POLICIES FORMING A PART OF POLICY.

"The above numbered Umbrella policy is completed by:

"(a) this Declarations, Form XL-10-0;
"(b) the Policy Provisions, Form XL-12-0;
"(c) the Policy Jacket, Form 6153;
"(d) any Endorsements forming part of the policy at issue.

"Form Numbers of Endorsements Forming Part of Policy At Issue:

"XL 11-0 XL 203-0 208-0 XL 209-0 XL 216-0 XL 243-0 255-0 XL 303 L 4233 0"

The "Extension Schedule of Underlying Insurance" states, "This extension schedule forms a part of the policy designated herein." Thereafter, three separate policies are listed, including the Hartford Business Auto Policy No. 51 AB FC6905.

Under the "Conditions" section of the policy under the title "Other insurance," the Hartford Umbrella policy provides:

"7. Other insurance

"The insurance afforded by this policy shall be excess insurance over any other valid and collectible insurance (except when purchased specifically to apply in excess of this insurance) available to the insured, whether or not described in the Extension Schedule of Underlying Insurance Policies, and applicable to any part of ultimate net loss, whether such other insurance is stated to be primary, contributing, excess or contingent; provided that if such other insurance provides umbrella coverage in excess of underlying insurance or the self-insured retention, the insurance afforded by this policy shall contribute therewith with respect to such part of ultimate net loss as is covered hereunder, but the company shall not be liable for a greater proportion of such loss than the amount which would have been payable under this policy bears to the sum of said amount and the amounts which would have been payable under each other umbrella policy applicable to such loss, had each such policy been the only policy so applicable."

SEQUOIA INSURANCE POLICY

The Sequoia Auto Policy No. CAP 600590 insured Clifton's Corner Drug, Inc., and James Petrocelli and covered the policy period July 1, 1982, through July 1, 1983. This policy provided liability coverage up to $500,000 per occurrence.

In the endorsement for basic automobile liability insurance, the policy specifically defines "other automobile" to mean "an automobile . . . not owned by or furnished for the regular use of either the individual named insured or any relative; but 'other automobile' does not include a temporary substitute automobile." Said endorsement further states: "B. With respect to other automobiles, the insurance afforded also applies subject to the following additional provisions:

". . . . . . . . . . . . . . . . . . .

"(3) this insurance with respect to other automobiles shall be excess insurance over any other valid and collectible insurance available to the insured."

The Sequoia policy was endorsed to provide coverage to resident relatives of the named insured, James Petrocelli, including Gina Petrocelli, while

operating nonowned vehicles. Under the conditions section of the policy, under the heading "Other Insurance," the Sequoia policy provides: "5. **Other Insurance** The insurance afforded by this policy is primary insurance, except when stated to apply in excess of or contingent upon the absence of other insurance. When this insurance is primary and the insured has other insurance which is stated to be applicable to the loss on an excess or contingent basis, the amount of the company's liability under this policy shall not be reduced by the existence of such other insurance.

"When both this insurance and other insurance apply to the loss on the same basis, whether primary, excess or contingent, the company shall not be liable under this policy for a greater proportion of the loss than that stated in the applicable contribution provision below:

"(a) **Contribution by Equal Shares** If all of such other valid and collectible insurance provides for contribution by equal shares, the company shall not be liable for a greater proportion of such loss than would be payable if each insurer contributes an equal share until the share of each insurer equals the lowest applicable limit of liability under any one policy or the full amount of the loss is paid, and with respect to any amount of loss not so paid the remaining insurers then continue to contribute equal shares of the remaining amount of the loss until each such insurer has paid its limit in full or the full amount of the loss is paid.

"(b) **Contribution by Limits** If any of such other insurance does not provide for contribution by equal shares, the company shall not be liable for a greater proportion of such loss than the applicable limit of liability under this policy for such loss bears to the total applicable limit of liability of all valid and collectible insurance against such loss."

TRANSAMERICA UMBRELLA POLICY

Transamerica Commercial Umbrella Policy (Transamerica Umbrella policy) No. U 4559444 insured James Petrocelli, doing business as Clifton's Corner Drug, Inc., and covered the policy period January 1, 1982, to January 1, 1985. This policy extended coverage to resident relatives of the named insured. Under the policy, coverage was "in excess of . . . the total amount of all limits of liability of applicable underlying insurance" and defined the term "underlying insurance" to mean "the policy or policies of insurance as described in the Schedule of Underlying Insurance in the declarations." The "Schedule of Underlying Insurance" found in the "Declarations" page of the Transamerica policy states, "AS PER 'COMMERCIAL UMBRELLA UNDERLYING LIMITS' ENDORSEMENT ATTACHMENT" AND

"As Per 'Personal Umbrella Underlying Limits' Endorsement Attached." These two endorsements provide that "The Insured Warrants That He Carries the Following Minimum Underlying Limits Coverages: . . . Automobile B.I. . . . $100/300 . . . P.D. . . . $50,000 . . . Combined B.I. & P.D. . . . $300,000." Under the "conditions" section of the Transamerica policy under the title "Other Insurance," it provides: "Other Insurance: If other valid and collectible insurance with any other insurer is available to the insured covering a loss also covered by this policy, other than insurance that is in excess of the insurance afforded by this policy, the insurance afforded by this policy shall be in excess of and shall not contribute with such other insurance. Nothing herein shall be construed to make this policy subject to the terms, conditions, and limitations of other insurance."

## DISCUSSION

I. *Is the Hartford Umbrella policy primary under the terms of the policy?*

■ *Olympic Ins. Co.* v. *Employers Surplus Lines Ins. Co.* (1981) 126 Cal.App.3d 593, 597-598 [178 Cal.Rptr. 908], provides the following guidance regarding liability insurance terminology and the definition of certain terms:

"A. *Types of Coverage*

"1. *Primary* coverage is insurance coverage whereby, *under the terms of the policy,* liability attaches *immediately* upon the happening of the occurrence that gives rise to liability. [Citation.] Primary insurers generally have the primary duty of defense.

"2. *'Excess'* or *secondary* coverage is coverage whereby, *under the terms of the policy,* liability attaches only after a predetermined amount of primary coverage has been exhausted. It is not uncommon to have several layers of secondary insurance (e.g., note the layering of coverage in the instant case: Pacific, then Employers 711, then Employers 690, then Lloyds). Secondary insurance is sometimes referred to as 'umbrella' insurance. When secondary insurance is written to be excess to identified policies, it is said to be 'specific excess.'

"B. *'Other Insurance' Clauses*

"A problem arises when two or more policies apply at the same level of coverage. Most insurance contracts include some provision attempting to

limit the insurer's liability in the event that another insurance policy covers the same loss.

 "There are several typical forms of 'other insurance' clauses:

"1. Pro rata. This clause provides that if there is other valid and collectible insurance, then the insurer shall not be liable for more than his pro rata share of the loss.

"2. Excess. This clause provides that if there is other valid and collectible insurance, then the insurer shall not be liable except to the extent that the loss exceeds such other valid and collectible insurance (i.e., this policy shall be excess to other valid and collectible insurance).

"3. Escape. This clause provides that the insurer is not liable for any loss that is covered by other insurance (i.e., the existence of other insurance extinguishes insurer's liability to the extent of such other insurance)." (Fn. omitted.)

 In this case, both the Hartford Business Auto Policy and the Sequoia Auto Policy are "primary" type policies, while the Transamerica Umbrella and the Hartford Umbrella policies both are "specific excess" or "umbrella" type policies. Apart from these classifications, however, several policies applicable to the same loss may be deemed "primary" or "excess" with respect to each other depending on a variety of factors including statutory presumptions, the "other insurance" clauses of the policies, etc., regardless of whether the policy is classified as "primary" or "specific excess." In this context, a "primary" type policy which is excess to another "primary" type policy may be termed an "incidental excess" policy since it is designed to be primary but is only incidentally excess by reason of the existence of other coverage; in contrast to a "specific excess" (umbrella) policy which is specifically intended to be an excess policy.

With respect to automobile liability insurance policies, Insurance Code[1] sections 11580.8 and 11580.9 were enacted in 1970 for the purpose of resolving, so far as possible, conflicts and litigation over which, of two or more applicable policies, were to be deemed primary or excess. Section 11580.9, subdivisions (a), (b), (c) and (d), set forth the four basic rules for determining the order of priority of several automobile liability insurance policies which are applicable to a given loss. The statute, where applicable, makes a definitive imposition of primary and/or excess liability on insurers

---

[1] All statutory references are to the Insurance Code unless otherwise indicated.

in given situations. (*Pacific Export Packers* v. *Chubb/Pacific Indem. Group* (1976) 57 Cal.App.3d 186, 191 [129 Cal.Rptr. 86].) Where none of the circumstances mentioned in subdivision (a), (b) or (c) of section 11580.9 apply, as in this case, subdivision (d) must next be looked to. (*Mission Ins. Co.* v. *Hartford Ins. Co.* (1984) 155 Cal.App.3d 1199, 1206 [202 Cal.Rptr. 635].)

Subdivision (d) of section 11580.9, as it read in 1983, provided as follows: "(d) Except as provided in subdivisions (a), (b), and (c), where two or more policies affording valid and collectible liability insurance apply to the same motor vehicle or vehicles in an occurrence out of which a liability loss shall arise, it shall be conclusively presumed that the insurance afforded by that policy in which the motor vehicle is described or rated as an owned automobile shall be primary and the insurance afforded by any other policy or policies shall be excess."

Under this subdivision, for a policy to be deemed primary, it must be one "in which the motor vehicle is described or rated as an owned automobile." In *Ohio Cas. Ins. Co.* v. *Aetna Ins. Co.* (1978) 85 Cal.App.3d 521 [149 Cal.Rptr. 562], the court interpreted this requirement to mean a "particularization" of the vehicle in the policy. (*Id.* at p. 524.) Bertram, who was insured by Aetna in that case, sold a vehicle described or rated as an owned vehicle under the Aetna policy to Gamma, insured by Ohio Casualty under a "fleet" type policy which did not describe or rate any vehicle but simply insured vehicles generally described as "owned" by Gamma. (*Id.* at p. 523.) The accident took place after Gamma acquired possession of and had agreed to purchase the vehicle, but before title had technically been transferred, although Gamma was nevertheless deemed the "owner" as well. Aetna contended that notwithstanding the fact the Ohio Casualty policy was a "fleet" policy and did not expressly describe or rate any vehicles, the Ohio Casualty policy was still primary since it insured all "owned" vehicles and that "a general description is sufficient" to meet the requirements of section 11580.9, subdivision (b). (*Id.* at p. 524.) The court disagreed with Aetna, stating: "The court is bound by the statute which requires description or rating; this, in commonsense understanding, means a particularization of the vehicle." (*Id.* at p. 524.)

In this case, of the four policies involved, only the Hartford Business Auto Policy No. 51 AB FC6905 is one in which the 1976 Chevrolet Blazer involved in the accident was "described or rated" as an owned automobile. In other words, it is the only policy in which there was a "particularization" of the vehicle in the policy. Neither the Sequoia policy, the Transamerica Umbrella policy, nor the Hartford Umbrella policy

contained any mention of, reference to, or "particularization" of the 1976 Chevrolet Blazer. For this reason, it seems clear that under section 11580.9, subdivision (d), only the Hartford Business Auto Policy is primary.

Sequoia and Transamerica contend, however, that the Hartford Umbrella policy also describes or rates the 1976 Chevrolet Blazer as an owned automobile by virtue of language contained on the "Declarations" page of the policy. As previously quoted, item 6 in the declarations page of the Hartford Umbrella policy refers to "Schedule of Underlying Insurance Policies" and states, "SEE ATTACHED EXTENSION SCHEDULE OF UNDERLYING INSURANCE POLICIES FORMING A PART OF POLICY." The "Extension Schedule of Underlying Insurance" also contains a similar reference by stating: "This extension schedule forms a part of the policy designated herein."

Sequoia and Transamerica contend that the above quoted language is the legal equivalent of a statement that the actual policies listed on the extension schedule, rather than the extension schedule itself, are incorporated by reference into the umbrella policy such that the 1976 Chevrolet Blazer described in the Hartford Business Auto policy automatically becomes "described" in the Hartford Umbrella policy making that policy primary as well under section 11580.9, subdivision (d).

To support its contention, Transamerica relies on *Heston* v. *Farmers Ins. Group* (1984) 160 Cal.App.3d 402 [206 Cal.Rptr. 585] and *Bell* v. *Rio Grande Oil Co.* (1937) 23 Cal.App.2d 436 [73 P.2d 662], quoting from *Bell* at page 440 as follows: "A written agreement may, by reference expressly made thereto, incorporate other written agreements; and in the event such incorporation is made, the original agreement and those referred to must be considered and construed as one. [Citations.]" The question, thus, is whether the language of the Hartford Umbrella policy is reasonably susceptible to the interpretation that it incorporated the Hartford Business Auto Policy by reference.

We reject Sequoia's and Transamerica's contention.

■ Policies of insurance, like other contracts, must be read as a whole with each part being read "in conjunction with other portions thereof." (*National Ins. Underwriters* v. *Carter* (1976) 17 Cal.3d 380, 384 [131 Cal.Rptr. 42, 551 P.2d 362].) Moreover, while policies of insurance containing ambiguous language are normally to be construed against an insurer, "[n]o term of a policy is ambiguous if its meaning can be ascertained by fair inference from the remaining terms." ■ ■ (*O'Doan* v. *Insurance*

*Co. of North America* (1966) 243 Cal.App.2d 71, 77 [52 Cal.Rptr. 184, 33 A.L.R.3d 684].)[2]

The basic policy form of the Hartford Umbrella policy consists of nine pages. Under the "Conditions" section under the title "Changes," the policy provides in part: ". . . nor shall the terms of this policy be waived or changed, except by endorsement issued to form a part of this policy . . . ." The conditions section under the title "Declarations," further provides in part: ". . . this policy embodies all agreements existing between the first named insured and the company or any of its agents relating to this insurance." All other parts of the policy, such as the declarations page on which the questioned language appears, the "Extension Schedule" and the "Endorsements," contain language stating that they form a "part of the policy" inasmuch as they are not contained within the basic nine-page policy form. This language is necessary in order to comply with the integration clause quoted above. In other words, in order to be consistent with the integration clause, the endorsements themselves, which are not part of the basic nine pages must, by definition, expressly become a "part of the policy" and the language used on the "Declarations" page, the "Extension Schedule" and the "Endorsements" is merely designed to accomplish this purpose.

It is thus clear, based upon both the language of the declarations page itself, as well as the language of the policy when read as a whole, that what is meant by the phrase "SEE ATTACHED EXTENSION SCHEDULE OF UNDERLYING INSURANCE POLICIES FORMING A PART OF POLICY" is that the "Extension Schedule" itself, and not the policies described and referred to therein, is what is made a "part of" the policy. There being no incorporation by reference of the Hartford Business Auto Policy into the Hartford Umbrella policy, the 1976 Chevrolet Blazer is not "described or rated as an owned automobile" in the umbrella policy and the trial court did not err in holding that section 11580.9 did not apply to the Hartford Umbrella policy.[3]

---

[2] Transamerica also points to section 11580.1, subdivision (b)(2), for the proposition that the Insurance Code itself recognizes the idea of a description of motor vehicles being included in an insurance policy by reference. Transamerica's reliance on section 11580.1, subdivision (b)(2), is misplaced. That section merely requires *either* an "explicit description of" or an "appropriate reference to" which vehicles are insured. As the *Ohio Cas. Ins. Co.* case, *supra,* 85 Cal.App.3d 521, demonstrates, an "explicit description of" is a sufficient particularization of the vehicle for purposes of the primary presumption of section 11580.9, subdivision (d). However, if a policy merely makes an "appropriate reference to" insured vehicles such as "all owned vehicles," it may comply with the requirements of section 11580.1, subdivision (b)(2), but is not a policy which "describes" a vehicle for purposes of section 11580.9, subdivision (d).

[3] Transamerica's suggestion that the trial court ignored the doctrine of incorporation by reference and embraced the proposition that the doctrine may not be used with reference to

Contrary to Transamerica's contention, the language of the Hartford Umbrella policy is not ambiguous. Instead, it is clear from reading the entire policy, as we are required to do, that incorporation by reference of the entire underlying Hartford Business Auto Policy was not intended. This being the case, the various rules of construction, which Transamerica contends we must apply, are inapplicable. ■ Furthermore, the general principle that insurance contracts must be construed against the insurer is also inapplicable here. As stated in *Argonaut Ins. Co.* v. *Transport Indem. Co.* (1972) 6 Cal.3d 496, 506 [99 Cal.Rptr. 617, 492 P.2d 673], "The principle that insurance contracts must be construed against the insurer is inapplicable here. That principle serves the goal of protecting the reasonable expectations of the insured, but in the present situation the issue of the effect of the P.U.C. endorsement on the excess insurance clause concerns only the respective liabilities of two insurers."

Similarly, Transamerica's reference to Civil Code section 1642[4] simply misses the mark. Section 1636 of the Civil Code provides, "A contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful." Civil Code section 1637 provides, "For the purpose of ascertaining the intention of the parties to a contract, *if otherwise doubtful,* the rules given in this Chapter are to be applied." (Italics added.) Civil Code section 1642 is simply one of the rules referred to in Civil Code section 1637 for aiding in the interpretation of a contract when the intent of the parties is "otherwise doubtful." Here, as just discussed, the proper interpretation of the Hartford Umbrella policy is not "doubtful." As such, Civil Code section 1642 has no bearing on the issue. In any event, Civil Code section 1642 is simply a rule to aid in the interpretation of contracts and to allow the construction of two contracts together in pursuit of that purpose. It does not, as Transamerica appears to contend, make two contracts one for all purposes. ■ As stated in *Malmstedt* v. *Stillwell* (1930) 110 Cal.App. 393, 398 [294 P. 41], "While it is the rule that several contracts *relating to the same matters are to be construed together* (Civ. Code, sec. 1642), it does not follow that for all purposes they constitute one contract."

contracts of insurance mischaracterizes the trial court's holding. It does not appear that the trial court ignored the doctrine but instead expressly found that Hartford's Umbrella policy did not "contain language purporting to incorporate by reference the Hartford Auto policy." In any event, the interpretation of the policies in question is a matter of law which is subject to independent determination by this court. (*Transport Indemnity Co.* v. *Royal Ins. Co.* (1987) 189 Cal.App.3d 250, 253 [234 Cal.Rptr. 516].)

[4] Civil Code section 1642 provides as follows: "Several contracts relating to the same matters, between the same parties, and made as parts of substantially one transaction, are to be taken together."

■ In summary, the Hartford Umbrella policy is a general umbrella liability policy insuring the persons insured for all types of "bodily injury, personal injury, property damage and advertising liability" subject to certain exclusions. There is no general exclusion for automobile coverage. Gina Petrocelli, the operator of the 1976 Chevrolet Blazer at the time of the accident, became an insured under the Hartford Umbrella policy by virtue of her permissive use of "any automobile owned by the named insured." In other words, the Hartford Umbrella policy does not insure any automobiles at all. It insures people, including those who permissibly use "owned" automobiles.

II. *Does section 11580.9, subdivision (d), control even where the vehicle is not described or rated as an owned vehicle?*

The trial court, after holding that section 11580.9, subdivision (d), requires the conclusion that the Hartford Business Auto Policy is primary and its policy limits must first be exhausted, stated, "[b]eyond that determination the statute does little to assist us in the resolution of this dispute." ■ Sequoia and Transamerica contend that the trial court's observation is incorrect.

Transamerica relies on *Transport Indemnity Co.* v. *Royal Ins. Co., supra,* 189 Cal.App.3d 250 and *Government Employees Ins. Co.* v. *Gibraltar Casualty Co.* (1986) 184 Cal.App.3d 163 [229 Cal.Rptr. 57] in contending that in determining the priority of policies in multipolicy cases under section 11580.9, the courts should try to have the order of priority tracked most closely with the descriptions of the vehicles in the policies and the ownership interests in the subject vehicles. In other words, Transamerica contends the Legislature, through the enactment of section 11580.9, has made a determination that where there are separate policies, as between the owner's policy and the driver's policy, the first priority and the primary coverage is with the owner's policy. The cases relied upon by Transamerica, however, are inapposite. Those decisions involved policies which clearly did "describe or rate" the insured vehicle and did not involve an umbrella policy containing no such reference. Moreover, Transamerica's contention that the *Transport* case stands for the proposition that the court should "try to have the order of priority tracked most closely with the descriptions of the vehicles in the policies and the ownership interests in the subject vehicles" is inaccurate. A reading of the opinion reveals no such holding.

Sequoia's reliance on *Fireman's Fund Indemnity Co.* v. *Prudential Assurance Co.* (1961) 192 Cal.App.2d 492 [13 Cal.Rptr. 629] is similarly unavailing. The *Fireman's Fund* case is distinguishable on the basis that the

appellant's insurance contract did not provide an effective "excess" clause. Instead, it appeared to attach upon depletion of the primary insurance policy which was specifically mentioned. In the instant case, the Hartford Umbrella policy does provide that its coverage is excess over all other primary insurance "whether or not described" in the "schedule of underlying insurance."

Sequoia's reliance on the case of *Hellman* v. *Great America Ins. Co.* (1977) 66 Cal.App.3d 298 [136 Cal.Rptr. 24] is difficult to understand. All that case held, as indicated by Sequoia's brief, is that, for purposes of medical payments coverage, a "primary" type policy issued to the driver is excess to the owner's policy describing the automobile being driven and that the driver's excess coverage was not responsible until the owner's primary coverage was exhausted. Thus, to the extent we hold that the Hartford Umbrella policy did not incorporate by reference the Hartford Business Auto policy, the *Hellman* case is of no help to Sequoia.

In short, neither the language of section 11580.9, subdivision (d), nor the cases relied upon by Sequoia and Transamerica indicate that subdivision (d) should be applied to make the Hartford Umbrella policy primary and Sequoia and Transamerica excess. Therefore, applying settled principles of insurance law, the trial court correctly ruled that the Sequoia policy is primary to the Hartford Umbrella policy and the Transamerica Umbrella policy, and that the latter two should prorate. ■ The court in *Olympic Ins. Co.* v. *Employers Surplus Lines Ins. Co., supra,* 126 Cal.App.3d 593, 600, stated the principle as follows: "A secondary policy, by its own terms, does not apply to cover a loss until the underlying primary insurance has been exhausted. This principle holds true even where there is more underlying primary insurance than contemplated by the terms of the secondary policy."

This rule is also acknowledged by the Supreme Court in *McConnell* v. *Underwriters at Lloyds* (1961) 56 Cal.2d 637, 646 [16 Cal.Rptr. 362, 365 P.2d 418], where the court stated, "Under such circumstances it is held that the excess insurance does not attach until all primary insurance has been exhausted."

■ The Hartford Business Auto Policy and the Sequoia policy are both "primary" type policies. Given the conclusive presumption provided in section 11580.9, subdivision (d), the Hartford Business Auto Policy is also primary to the Sequoia policy. The priority of liability of the remaining policies is not governed by section 11580.9, subdivision (d). Furthermore, since each of the remaining insurance policies have valid provisions

regarding "other insurance," those provisions in essence cancel each other out. Therefore, the priority is governed by the well-established rules set forth in *Olympic* and *McConnell, supra.* Specifically, the Sequoia policy herein is a "primary" type automobile policy with standard "excess as to nonowned automobiles" language and is therefore excess to the Hartford "primary" policy but primary with respect to both the Hartford Umbrella policy and the Transamerica Umbrella policy. Since the Hartford Umbrella policy and the Transamerica Umbrella policy are both "specific excess" policies and both contain "excess over all other valid and collectible insurance" clauses, neither can be deemed primary or secondary to the other and, therefore, their coverage prorates. (See *Lovy* v. *State Farm Insurance Co.* (1981) 117 Cal.App.3d 834 [173 Cal.Rptr. 307].)

III. *Does the declaration of expert witness Frank Polifka submitted in connection with the motion for reconsideration raise a triable issue of fact?*

Following the trial court's decision on motion for summary judgment, a motion for reconsideration was made by Transamerica and joined in by Sequoia. Although the motion was objected to as untimely, the trial court indicated that the motion would be heard and considered. ██ Hartford nevertheless reraises the untimeliness objection and also contends the motion for reconsideration was not based on any newly discovered evidence and was, therefore, improper as a matter of law. We reject these contentions.

The trial court's ruling on the timeliness issue was well within its discretion and such ruling cannot be disturbed on appeal absent a showing of abuse of discretion. (*Travelers Ins. Co.* v. *Superior Court* (1977) 65 Cal.App.3d 751, 759-760 [135 Cal.Rptr. 579]; *Magallanes* v. *Superior Court* (1985) 167 Cal.App.3d 878, 882 [213 Cal.Rptr. 547].) Contrary to Hartford's contention, the trial court's "decision on motion for summary judgment" was not a "final order" at the time the motion for reconsideration was filed since a final judgment had not been entered. (*Blue Mountain Development Co.* v. *Carville* (1982) 132 Cal.App.3d 1005, 1013 [183 Cal.Rptr. 594].) As such, the trial court not only had discretion to hear the motion, the motion for reconsideration did not have to be based on any newly discovered evidence. (*Ibid.*; *Rains* v. *Superior Court* (1984) 150 Cal.App.3d 933, 943-944 [198 Cal.Rptr. 249].)

██ Proceeding to the merits, Transamerica contends that the declaration of insurance agent, and purported expert witness, Frank Polifka, raises at least a triable issue of fact with regard to whether the language in the

Hartford Umbrella policy is reasonably susceptible to the construction that it incorporates the underlying policy by reference.

While Transamerica is correct that the trial court did not specifically indicate that it was considering the declaration of Mr. Polifka on its merits, in its amended declaratory judgment and judgment, the court stated that it had "considered all of the documents filed in support of and in opposition to said Motion for Reconsideration and having considered said motion on its merits, the court denied the Motion for Reconsideration." There is also nothing in the record to indicate that the trial court declined to consider the declaration. ▆▆ We reject Transamerica's contention since we must apply the " 'fundamental principle that all presumptions and intendments are in favor of the regularity of the action of the lower court in the absence of a record to the contrary.' " (*People* v. *Green* (1979) 95 Cal.App.3d 991, 1001 [157 Cal.Rptr. 520].) ▆▆ Thus, while Transamerica is correct that *Pacific Gas & E. Co.* v. *G. W. Thomas Drayage, etc. Co.* (1968) 69 Cal.2d 33 [69 Cal.Rptr. 561, 442 P.2d 641, 40 A.L.R.3d 1373] controls the issue, it is incorrect in contending that the trial court gave no consideration to the declaration of Mr. Polifka or the *Pacific Gas & E.* case.

▆▆ In any event: "Where, as here, the issue is one of contractual interpretation and there is no conflicting extrinsic evidence as to the proper interpretation, the issue is a question of law as to which the appellate court is in as good a position as the trial court to pass; accordingly, the appellate court is not bound by the trial court's interpretation and must arrive at its own interpretation de novo. [Citations.]" (*Southern Pacific Land Co.* v. *Westlake Farms, Inc.* (1987) 188 Cal.App.3d 807, 817 [233 Cal.Rptr. 794].) ▆▆ Transamerica contends that the offered declaration of Mr. Polifka is relevant to prove a meaning to which the language of the Hartford Umbrella policy is reasonably susceptible—that when the umbrella policy states that the primary policy forms a part of the umbrella policy, it is meant to include the list of vehicles in the primary policy and that is, in fact, a very common way of incorporating the schedule of vehicles listed in the primary policy into the umbrella policy.

The declaration of Frank Polifka shows that he was an agent for Farmers Insurance Company. He did not claim to have ever worked for Hartford, written any policies through Hartford, or to have any knowledge of Hartford's policies. Rather, the most Mr. Polifka offered was his understanding of the practices of Farmers Insurance Company and other unidentified insurance companies with whom he has worked, along with his opinion of the purpose of an umbrella liability policy making reference to a schedule of underlying insurance policies.

Hartford contends, and we agree, that this type of "expert" testimony is not admissible with respect to the question of the proper interpretation of the "language" of the Hartford policy. ■■ Hartford relies on *Transport Indem. Co.* v. *American Fid. & Cas. Co.* (1970) 4 Cal.App.3d 950 [84 Cal.Rptr. 856], where the court upheld the trial court's exclusion of expert testimony offered to explain the "purpose" of a particular provision in an insurance policy, stating: "While under some circumstances parol testimony is admissible to establish the meaning attached by the parties to an apparently unambiguous instrument [citation], the excluded testimony was not offered for that purpose. It was tendered as the opinion of an expert as to what he thought the parties intended. As such, it was properly excluded." (*Id*. at p. 960; see also *Pacific Indemnity Co.* v. *Fireman's Fund Ins. Co.* (1985) 175 Cal.App.3d 1191, 1203 [223 Cal.Rptr. 312].) ■■ Moreover, Polifka's declaration does not, in the face of the clear language of the Hartford Umbrella policy, establish that the language of the policy is reasonably susceptible to the meaning urged by Transamerica, and thus the declaration does not operate to raise a triable issue of fact.

■■ "While extrinsic evidence may be considered by a court as an aid in the interpretation of a written contract when it is 'relevant to prove a meaning to which the language of the instrument is reasonably susceptible' [citation], ' " '[i]f the evidence offered would not persuade a reasonable man that the instrument meant anything other than the ordinary meaning of its words, it is useless.' " ' [Citation]" (*Producers Dairy Delivery Co.* v. *Sentry Ins. Co.* (1986) 41 Cal.3d 903, 913 [226 Cal.Rptr. 558, 718 P.2d 920].) ■■ Furthermore, nowhere in the Polifka declaration is the statement made or the opinion expressed that the language of the declarations page of the Hartford Umbrella policy reading "SEE ATTACHED EXTENSION SCHEDULE OF UNDERLYING INSURANCE POLICIES FORMING A PART OF POLICY" meant that the actual underlying policies themselves were incorporated by reference into and formed a part of the Hartford Umbrella policy. In this regard, all Mr. Polifka states is that the Hartford umbrella policy "states that the schedule of underlying insurance policies forms a part of the Hartford umbrella insurance policy." This is simply a restatement of the policy language and does not even express Mr. Polifka's opinion as to what is "meant" by that language according to insurance industry custom and practice.

IV. *Is Hartford entitled to prejudgment interest from Transamerica on Hartford's cross-appeal?*

■■ Hartford contends that it was entitled to receive an award of prejudgment interest against Transamerica and has filed a cross-appeal arising

from the trial court's denial of a prejudgment interest award. Both parties concede that the relevant statute is Civil Code section 3287, subdivision (a), which provides in pertinent part: "(a) Every person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in him upon a particular day, is entitled also to recover interest thereon from that day, except during such time as the debtor is prevented by law, or by the act of the creditor from paying the debt."

In support of its contention, Hartford relies upon *California Food Service Corp.* v. *Great American Ins. Co.* (1982) 130 Cal.App.3d 892, 901-902 [182 Cal.Rptr. 67], *Travelers Ins. Co.* v. *Industrial Indem. Co.* (1971) 18 Cal.App.3d 628, 630-632 [96 Cal.Rptr. 191], and *Oil Base, Inc.* v. *Transport Indem. Co.* (1957) 148 Cal.App.2d 490, 492-493 [306 P.2d 924].

In *California Food Service Corp.* v. *Great American Ins. Co., supra,* 130 Cal.App.3d 892, there was no dispute as to differing methods of proration between the insurance carriers. The court ruled that the two insurance carriers were simply required to split the loss on a 50-50 basis. Thus, there was a sum certain. The sole dispute in that case was whether the nonpaying carrier was responsible for any sum.

In *Travelers Ins. Co.* v. *Industrial Indem. Co., supra,* 18 Cal.App.3d 628, it was simply noted in the opinion that Travelers had received a judgment with prejudgment interest. However, there was no discussion in the opinion as to the correctness or incorrectness of such award. It appears that that issue was not raised before the Court of Appeal.

In *Oil Base Inc.* v. *Transport Indem. Co., supra,* 148 Cal.App.3d 490, the court was clearly dealing with a sum certain, $100,000, advanced by one of the insurance carriers to the insured to protect the insured's interest. Recovery of that sum was then sought from another insurer. There was no discussion of proration between policies in that matter, and it was clear from the outset that the sum sought and ultimately recovered against the nonpaying insurer was $100,000.

Transamerica, on the other hand, relies on *Canavin* v. *Pacific Southwest Airlines* (1983) 148 Cal.App.3d 512 [196 Cal.Rptr. 82] and *Polster, Inc.* v. *Swing* (1985) 164 Cal.App.3d 427 [210 Cal.Rptr. 567]. In *Canavin, supra,* the court held that Civil Code section 3287, subdivision (a), provides for prejudgment interest "'where there is essentially no dispute between the parties concerning the basis of computation of damages if any are recover-

able but where their dispute centers on the issue of liability giving rise to damage.' " (*Canavin, supra,* at p. 524.)

In *Polster, supra,* 164 Cal.App.3d 427, the court interpreted Civil Code section 3287, subdivision (a), as follows: "This section does not authorize prejudgment interest as a matter of law where the amount of damages depends upon a judicial determination based upon conflicting evidence. [Citations.]

"Prejudgment interest runs from the date when damages are certain or are capable of being calculated to a certainty. [Citation.]

" '[T]he certainty requirement of section 3287, subdivision (a) has been reduced to two tests: (1) whether the debtor knows the amount owed or (2) whether the debtor would be able to compute the damages.' [Citation.]" (*Polster, Inc.* v. *Swing, supra,* 164 Cal.App.3d at pp. 434-435.) Transamerica contends that here the dispute between Hartford and Transamerica has not only been over liability (whether the Hartford policies have to bear the entire loss), it has also been over the nature and extent of any recovery to Hartford if applicability of the Transamerica policy were demonstrated. Transamerica concludes that since the issue was far from settled prior to the trial court's ruling, *Canavin* and *Polster* indicate prejudgment interest under Civil Code section 3287, subdivision (a), is not recoverable where, as here, the amount of liability, if any, remains in dispute until judgment.

While Hartford's right to recover damages from Transamerica, like Hartford's right to recover damages from Sequoia, was in issue, the amount of damages recoverable was "certain, or capable of being made certain by calculation" and was "vested" in Hartford on October 14, 1986, the day Hartford exhausted its primary policy limit and first paid out money under its umbrella policy. Assuming Hartford was entitled to recover damages, the only question remaining was how the trial court would prioritize the policies. In this respect, the trial court had only two options: (1) to hold, as it did, that the Sequoia policy was second in order and that the Hartford and Transamerica policies share the excess liability on a prorata basis, or (2) that the Hartford Umbrella policy and the combined limits of the Sequoia and Transamerica policies be prorated. This was purely a question of law since the amount of damages under either formula was readily ascertainable by mathematical calculation. Thus, the amount of damages was never "unliquidated" or "contingent" but rather, only the legally proper order of priority of the respective policies was uncertain. Under these circumstances, Hartford is entitled to prejudgment interest.

## DISPOSITION

Paragraph 3 of page 4 of the judgment entered herein on October 21, 1987, is modified to read as follows:

"3. That Plaintiff, Hartford Accident and Indemnity Company, shall have and recover from Defendant Transamerica Insurance Company the sum of $268,418.00 as principal plus $18,789.26 as prejudgment interest at the rate of 7% per annum from October 14, 1986, through October 14, 1987."

As so modified, the judgment is affirmed. Hartford Accident and Indemnity Company shall have its costs on appeal.

Stone (W. A.), J., and Ardaiz, J., concurred.

The petition of appellant Sequoia Insurance Company for review by the Supreme Court was denied September 27, 1989.